## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

**CREATIVE TOUCH INTERIORS, INC. d/b/a,**
**HD SUPPLY INTERIOR SOLUTIONS,**
a Maryland corporation,

    **Plaintiff,**

v.

Civil Action No. _____

**STEVEN E. SPADE, DAVID TRIASSI,**
**BOBBY VALLEJOS, WILLIAM MATTHEWS,**
**KATHRYN JONES, and**
**ALLY BUILDING SOLUTIONS, LLC,**
a Florida Limited Liability Company,

    **Defendants.**

### COMPLAINT

COMES NOW the Plaintiff, Creative Touch Interiors, Inc. d/b/a HD Supply Interior

Solutions ("CTI"), by counsel, and for its Complaint against Defendants, STEVEN E. SPADE

("Spade"), DAVID TRIASSI ("Triassi"), BOBBY VALLEJOS ("Vallejos"), WILLIAM

MATTHEWS ("Matthews"), KATHRYN JONES ("Jones"), and ALLY BUILDING

SOLUTIONS, LLC ("Ally") (collectively "the Defendants"), state the following:

### INTRODUCTION

CTI brings this action to recover damages caused by Defendants' conspiracy to decimate

CTI's business and steal its customers. Notwithstanding that Triassi, Vallejos, and Jones (the

"Former Jacksonville CTI Senior Managers") held senior level positions with CTI, and thus,

owed the highest fiduciary duty to CTI, the Former Jacksonville CTI Senior Managers as well as

Matthews conspired with Spade and Ally, to leave, en mass, pursuant to a planned sequenced

departure to work for CTI's competitor, Ally. Their resignations stripped CTI of its Branch

Manager, Production Manager, Field Operations Manager and Account Executive in CTI's Jacksonville branch, and thereby deprived CTI of an effective means to retain customers and to maintain vendor relations. When they left, the Former Jacksonville CTI Senior Managers took CTI's confidential information and trade secrets and used that information to assist Ally in stealing CTI's top customers. As a result of Defendants unlawful and tortious conduct, CTI has lost millions of dollars in business, and had its customer and vendor relations irreparably harmed.

## PARTIES

1.     CTI is a Maryland corporation with its principal place of business in Atlanta, Georgia. CTI is a leading provider of interior finish solutions to the construction industry. CTI offers turnkey project management, supply and installation of multiple interior product options and concierge level design center services in thirty-eight states. CTI does business in Duval County, Florida.

2.     CTI customers include homebuilders, homebuyers, project owners, commercial contractors and architects. The primary products provided by CTI include flooring, such as carpet, hardwood, tile (floor and wall), natural stone, vinyl, laminate and LVT, and window coverings, countertops and cabinets.

3.     Spade formed Ally as a Florida Limited Liability Company, with its principal place of business located in Duval County, Florida. As a direct competitor of CTI, Ally provides interior finish solutions to the construction industry.

4.     Spade is the Managing Member of Ally and a former employee of CTI. Upon information and belief, Spade is also the sole member of Ally. Spade is a resident of Orange County, Florida.

2

5.　　CTI employed Triassi for approximately fourteen years. Before terminating his employment with CTI, Triassi served as Branch Manager of CTI's Jacksonville, Florida branch.

6.　　As Branch Manager for CTI's Jacksonville operations, Triassi had overall responsibility for managing CTI's sales, margin, profitability and overall operations for the Jacksonville branch. Katie Jones, the account executive who was responsible for developing and maintaining customer relations, reported to Triassi, as did Vallejos and Matthews. Triassi was unique from other Branch Managers in that he previously was an estimator. As such, Triassi did his own takeoffs – meaning he did his own estimating which included determining the quantities of materials to be ordered. Indeed, he worked closely with the CTI Sales Support and Estimating teams in using sophisticated and detailed tools developed by CTI to determine and optimize quantities and pricing, which enabled it to competitively bid for customer projects.

7.　　Triassi is now employed by Ally, and he is a resident of Duval County, Florida.

8.　　CTI employed Vallejos for approximately twelve years. Before terminating his employment with CTI, Vallejos served as CTI's Production Manager in the Jacksonville, Florida branch.

9.　　As Production Manager, CTI imparted Vallejos with responsibility to meet production schedules and installation quality objectives for the Jacksonville branch. Specifically, Vallejos ensured that the Jacksonville branch established and maintained relationships with the installers and the builders. He ensured that CTI and its installers had the necessary tools and crews so that CTI could meet the production and installation schedules and deliver the highest quality services to CTI customers in a timely manner.

10.　　Vallejos is now employed by Ally, and he is a resident of Duval County, Florida.

11.     CTI employed Matthews for approximately seven and a half years. Before terminating his employment with CTI, Matthews served as CTI's Field Operations Manager in the Jacksonville, Florida branch.

12.     As Field Operations Manager, Matthews oversaw operations in the field at customer sites. He performed the critical duties of ensuring CTI met customer expectations for the completion of field projects and tasks.   Matthews worked closely with customers and resolved problems that arose during the installation of products and services supplied by CTI.

13.     Matthews is now employed by Ally, and he is a resident of Duval County, Florida.

14.     CTI employed Jones for approximately three years as an Account Executive in the Jacksonville, Florida branch. As an Account Executive, Jones was responsible for building and maintaining customer relationships in her territory. Her role was not just limited to sales, but focused on relationship building and required her to be the primary point of contact for CTI customers throughout the entire project process from sale through installation. Jones served as the face of CTI to its customers.

15.     In performing her duties as Account Executive, Jones served as the liaison between customers and CTI sales management, purchasing and operations to ensure customer satisfaction. She identified unique project requirements for customers and developed a project management strategy to meet the customers' needs.

16.     Jones worked closely with the CTI Sales Support and Estimating teams in using sophisticated and detailed tools developed by CTI to determine and optimize quantities and pricing, which enabled CTI to competitively bid for customer projects.

17.     Jones is now employed by Ally, and she is a resident of Duval County, Florida.

4

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C.

§ 1331, because this action arises out of Defendants' violations of the Federal Computer Fraud

and Abuse Act, 18 U.S.C. § 1030 *et. seq.* This Court has supplemental jurisdiction over the

remaining statutory and common law claims pursuant to 28 U.S.C. § 1367.

19.     This Court also has subject matter jurisdiction over this matter pursuant to 28

U.S.C. § 1332, because diversity of citizenship exists between the parties and the amount in

controversy is in excess of $75,000.00.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), because all

Defendants are residents of Florida and reside or work in the Jacksonville Division of the United

States District Court for the Middle District of Florida, and under 28 U.S.C. § 1391(b)(2),

because the events or omissions giving rise to Plaintiff's claims occurred in Duval County,

Florida, which is in the Jacksonville Division of the United States District Court for the Middle

District of Florida pursuant to Local Rule 1.02.

21.     This Court has personal jurisdiction over the Defendants pursuant to Rule 4 of the

Federal Rules of Civil Procedure and Florida law, including Fla. Stat. Ann. § 48.193, because

Defendants reside in Duval County, Florida, committed improper acts in Duval County, Florida,

and conduct substantial business in Duval County, Florida.

## FACTS

22.     Before December 2005, Spade owned Traditional Floorcovering of Florida, Inc.

("Traditional"), a Florida corporation engaged in the business of providing design center

showrooms for new residential homebuilders. Traditional also supplied and installed (i) vinyl,

laminate, ceramic, marble, hardwood and carpeting flooring materials, and (ii) window treatments selected by the homebuyers.

23.     In December 2005, Spade sold his ownership interest in and substantially all of the assets of Traditional to CTI.  At that time, CTI was known as Floors, Inc.  As part of the transaction, CTI paid Spade approximately $30 million. CTI also employed Spade until March 2009.  Thereafter, Spade provided consulting services to CTI until March 2010.

24.     On or about July 25, 2013, Spade formed Ally for the purpose of stealing CTI's Jacksonville, Florida business.

25.     In furtherance of his objective, Spade met with his long-time friend, Triassi, who had worked with Spade at Traditional and later, at CTI, and they conspired, together with Vallejos, Matthews and Jones, to divert CTI's business and installers to Ally.  Vallejos had also worked with Spade at Traditional, and later with Spade at CTI until 2009.

26.     As part of this plan, Spade conspired with the former Jacksonville CTI Senior Managers and Matthews to:

a.      have the Former Jacksonville CTI Senior Managers and Matthews terminate their employment with CTI, sequentially *en mass,* and without adequate notice, and thereby deprive CTI of critical management and operational functions for its Jacksonville, Florida operations;

b.      to have the Former Jacksonville CTI Senior Managers and Matthews solicit each other, as well as other employees to depart CTI at or around the same time, and to work for Ally; and

    c.    to have the Former Jacksonville CTI Senior Managers take CTI's confidential propriety information and trade secrets with them to Ally to use while employed by Ally in order to steal CTI's business for Ally's benefit.

27.    The conspiracy began in or about February 2014. By that time, Triassi began to make preparations to leave CTI and go to work for Ally, yet he did not tell his supervisors at CTI that he, along with the other senior managers and Matthews in the Jacksonville branch were planning to leave CTI. Indeed, on or about February 11, 2014 (two months before his departure from CTI), Triassi received an email on his non-work related yahoo email account from an office furniture representative providing Triassi with a quote for a substantial amount of office furniture. Triassi then sent this email to himself at his CTI email address. The names of the excel spreadsheets attached to the email were: "ALLYQUOTESEMIFINAL2082014" and "ALLYCONTRACTORS02112014." Triassi had no business reason to obtain this office furniture quote for CTI. This office furniture was for Ally.

28.    The Former Jacksonville CTI Senior Managers and Matthews plotted with Spade and Ally to access and take CTI's trade secrets, employees and installers in order to unfairly compete against CTI. The confidential proprietary information and trade secrets that they plotted to take included, but are not limited to bid matrices, customer presentations, labor and product pricing data, customer and vendor contact data, and customer preference data.

29.    The bid matrices in particular are trade secrets because CTI developed the bid matrices through a process which involved testing various pricing and product combinations which are then offered to clients. Once the correct combination of pricing and products are selected and accepted by the customer, CTI uses this model on future customer projects in order

to maximize efficiencies and profitability, while minimizing costs to the customer. CTI has taken steps to maintain the process involving creating a bid matrix as a secret.

30. CTI spent years creating and perfecting these types of bid matrices.

31. Pursuant to the conspiracy, on April 22, 2014, Triassi submitted his letter of resignation effective April 29, 2014. Although he knew that other CTI employees who held senior management positions with CTI were also intending to resign, Triassi kept quiet and did not disclose the information, in breach of his fiduciary duty to CTI. Jones, for example, resigned before Triassi and Triassi told CTI he did not know where Jones was going to work. This was false.

32. The day before and the day of Triassi's departure, and in furtherance of the conspiracy, Triassi used his CTI issued laptop computer to access voluminous numbers of critical CTI databases, portals, folders and files (including estimating files, takeoffs and material cost sheets), all of which contained CTI's confidential proprietary information and trade secrets. This information included customer pricing data, material costs, labor costs, overhead costs and bid information. Triassi printed, copied, transferred or otherwise took this confidential proprietary information and trade secrets with him to use during his employment with Ally. In addition, after Triassi left employment, CTI discovered that he had taken all working papers involving his estimation work at the Jacksonville branch. Normally, Triassi's office would have contained documents and files containing material cost sheets and takeoffs from Triassi's estimation work. Triassi took this proprietary and trade secret information. The material cost sheet alone contains labor costs, materials costs, customer pricing data and margin data. By taking the material cost sheets and estimating quantities of products, Triassi and Ally can quickly

and easily meet or undercut CTI's proposals to customers. The material cost sheet would allow Ally to immediately start doing business with CTI customers.

33.     Before Triassi left CTI, a CTI employee saw Triassi deleting scans and documents off the printer in an attempt to cover up what he was doing.

34.     CTI did not authorize Triassi to access CTI's computer stored data for the purpose of taking CTI's confidential proprietary information and trade secrets with him to a competitor.

35.     After receiving Triassi's resignation, CTI informed Triassi not to disclose this to any associates while the company worked on a plan of action to prepare for Triassi's departure. However, within 24 hours of Triassi resigning, Vallejos also submitted his resignation. Suspiciously, Vallejos copied Sean Gibson, Regional Director, East, on his resignation. Copying Mr. Gibson on an employee resignation is highly unusual, especially when Mr. Gibson and Mr. Vallejos had only met one time in several years. Normally, someone like Vallejos would submit his resignation to the Branch Manager, Triassi, and that is it. This demonstrates Vallejos knew Triassi also had submitted his resignation. This sequencing of departures was part of the conspiracy. While Vallejos knew that he and others would be leaving CTI when Triassi gave his resignation notice, Vallejos said nothing to CTI in breach of his fiduciary duty.

36.     The departure of Triassi and Vallejos within a 24 hour period deprived CTI of key leadership from its Branch Manager and Production Manager in the Jacksonville branch.

37.     On April 18, 2014, Jones resigned her employment with CTI and Matthews resigned his employment shortly thereafter, on May 1, 2014.

38.     Before Jones gave CTI notice of her resignation and in furtherance of the conspiracy, she inserted a Lexar flash drive (SN: 432CCO7E88BE3A16D1BD&0) into her CTI work laptop at 11:46 a.m., on April 8, 2014. Jones thereafter and without authorization from

9

CTI downloaded to the flash drive a number of CTI's confidential proprietary documents and trade secrets, including CTI bid and presentation information, customer pricing and preference information.

39.    Jones downloaded CTI's confidential proprietary information and trade secrets as part of the conspiracy to arm Ally with critical product selection, labor and customer pricing and margin data that Ally could use to take CTI's customers, which it did.  Providing this confidential proprietary information and trade secrets to Ally permitted Ally to underbid CTI and then provide CTI's customers a seamless transition from CTI to Ally.  Absent this seamless transition, customers would have been unwilling to transfer their work to Ally.

40.    Significantly, the confidential, proprietary and trade secret data Jones and Triassi provided to Ally allowed it to instantly have successful bid proposals for CTI customers without having to go through the time consuming and expensive trial and error period to finalize the bid proposals. For example, creating a bid proposal and material cost sheet for a customer or project takes many weeks.  Ally never engaged in this process so it never incurred the costs and risks associated with developing these secrets.

41.    Additionally, the theft of CTI's pricing and bid data permitted Ally to bid for work at a price it knew would meet or undercut CTI's prices. Thus, Ally was able to gain market share at CTI's expense. Thus, Ally unlawfully has used CTI's own innovative bid and business development strategies against CTI.

42.    The Defendants have used the information downloaded by Jones to the flash drive to help Ally solicit CTI's current and former customers, and in order to obtain business from CTI's top customers, such as Standard Pacific and ICI. Defendants' misappropriation of CTI's

confidential proprietary information and trade secrets has caused CTI to suffer the loss of work and millions of dollars in profits.

43.     In furtherance of the conspiracy, Matthews used his CTI laptop computer to access his Drop Box account the day before he left CTI's employment on April 30, 2014.   Upon information and belief Matthews placed CTI's trade secret and confidential proprietary information in this Drop Box to use while employed by Ally. CTI did not authorize Matthews to take its data and place it in his Drop Box. Further, on Matthews' last day of work, he disappeared for most of the day and performed no work.  When he returned, he quit and turned in his blackberry device and work laptop computer, both wiped clean of any CTI data.

44.     Right before the termination of their employment with CTI and in an effort to hinder discovery of their misdeeds, Matthews and Jones wiped from their CTI laptop computers almost all the data that had been stored in the computers.  Matthews and Jones destroyed approximately 650 mb of data from CTI's computers.

45.     CTI did not authorize Matthews or Jones to delete these files from their computers. The confidential proprietary data destroyed by Matthews and Jones included customer information, customer project status information, customer checklists, and customer pricing, along with product data and specifications for projects, and product order information. CTI has been unable to recreate or duplicate much of the data erased from the CTI computers issued to Matthews and Jones, which has caused CTI significant hardship and costs, including that CTI was unable to properly service their customers due to missing data.

46.     In furtherance of their conspiracy, the Defendants also solicited the resignation of a CTI Jacksonville warehouse associate, James Immel. James Immel now works for Ally.

47.     Thus, out of the approximately seven individuals who worked out of CTI's Jacksonville branch, Defendants enticed and facilitated the departure of five key employees who left to go work for Ally within a short period of time. This mass departure devastated CTI's business in the Jacksonville, Florida area.

48.     CTI sent one of its other managers, Chris Sturgell, to the Jacksonville branch in an effort to rebuild its operations and maintain its business. Not content with taking all the key personnel who had been working as a team at Jacksonville branch, Triassi also attempted to solicit Mr. Sturgell to work for Ally in violation of a non-solicitation agreement he had with CTI. This is evidenced by a text Triassi sent Mr. Sturgell on April 29 or April 30, 2014, where Triassi wrote: "What time you heading out? Look forward to the possibilities of you working with Steve [Spade] and team you asked about. We can catch up. Call you today." Following receipt of Triassi's text, Mr. Sturgell talked with Triassi and confirmed that Ally wanted Mr. Sturgell to go work for Ally. Mr. Sturgell refused Triassi's overtures.

49.     As a result of Defendants' conspiracy and wrongful conduct, Ally took one of CTI's largest and most profitable clients, ICI. As a result of losing ICI as a customer, CTI has lost approximately three million dollars in business.

50.     Further, as a result of Defendants' unlawful conduct, CTI's other major customers drastically reduced the business they conducted with CTI. CTI has lost approximately four million of dollars in business from KB Homes, Maronda Homes, Standard Pacific and David Weekley.

51.     Before Ally and Spade conspired with the Former Jacksonville CTI Senior Managers and Matthews and misappropriated CTI's confidential proprietary information and trade secrets, CTI had been the sole provider for ICI, Standard Pacific and David Weekley.

These clients were amongst CTI's top four clients for the Jacksonville branch in terms of annual revenue and profit margins. Ally did not do business with any of them before the departure of the Former Jacksonville CTI Senior Managers and Matthews. As a direct and proximate result of the conspiracy, Ally took all or a majority of the business provided by these clients from CTI.

52.     Immediately upon the departure of Triassi, Jones, Matthews and Vallejos from CTI, ICI ceased doing all business with CTI. Shortly thereafter, Standard Pacific also ceased doing approximately 80% of its business with CTI as compared to before the departure of Triassi, Jones, Matthews and Vallejos from CTI; and David Weekley ceased doing approximately 40-50% of its business with CTI after the departure of Triassi, Jones, Matthews and Vallejos from CTI. All of this lost business went to Ally.

53.     Immediately after their departure, the Former Jacksonville CTI Senior Managers and Matthews interfered with CTI's contractual relationships with its installers who performed work for CTI to service CTI's customers, including for David Weekley, Standard Pacific and ICI. For example, on June 9, 2014, Spade emailed Kevin Barber (with copies to Triassi and Jones), representative for Emser Tile, which is CTI's preferred tile supplier, and discussed when Ally could set up a meeting with Emser Tile.

54.     Several of CTI's preferred installers left CTI (without completing their work) to go perform work for Ally. This created significant hardship for CTI to meet the current needs of its pending projects which Defendants knew would occur.

## COUNT I – BREACH OF FIDUCIARY DUTY
### (AGAINST TRIASSI, VALLEJOS, MATTHEWS AND JONES)

55.     CTI incorporates by reference the allegations contained in the preceding paragraphs as though fully restated herein.

56.     While employed by CTI, the Former Jacksonville CTI Senior Managers and Matthews owed CTI a fiduciary duty, including a duty of loyalty.  After their departure from CTI, they owed CTI a continuing fiduciary duty not to disclose or use CTI's confidential proprietary information and trade secrets.

57.     The Former Jacksonville CTI Senior Managers and Matthews breached their fiduciary duty to CTI (i) by soliciting CTI employees (themselves and others) and/or customers and installers while employed by CTI;  (ii) by conspiring to leave en mass and in a sequence that would leave CTI without any senior managers and a Field Manager (Matthews)  to run the Jacksonville operations; (iii) by failing to tell senior executives at CTI that senior managers and Matthews were planning to leave en mass from the Jacksonville branch; (iv) by using or directing for their own benefit and that of Spade and Ally, CTI's confidential proprietary information or trade secrets during their employment, and (v) by using or directing for their own benefit and that of Spade and Ally, CTI's confidential proprietary information or trade secrets after their employment ended.

58.     In addition, Triassi, Matthews and Jones violated their duty of loyalty by accessing, copying and/or deleting CTI's confidential proprietary information and trade secrets data from CTI's laptop computer and blackberry devices issued to them.

59.     CTI has been damaged in an amount no less than $6,000,000 dollars as a result of the Former Jacksonville CTI Senior Managers' and Matthews' breach of their fiduciary duty to CTI.

60.     CTI continues to suffer damage as a result of the Former Jacksonville CTI Senior Managers' and Matthews' breach of their fiduciary duty to CTI, which could exceed $10,000,000.

14

## COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (SPADE AND ALLY)

61.    CTI incorporates by reference the allegations contained in the preceding
paragraphs as though fully restated herein.

62.    While employed by CTI, the Former Jacksonville CTI Senior Managers and
Matthews owed CTI a fiduciary duty to act in the best interests of CTI and to prefer at all times
the best interests of CTI over their own. The Former Jacksonville CTI Senior Managers and
Matthews owed CTI a duty to not use or disclose CTI's confidential information and trade
secrets for their own benefit or the benefit of others.

63.    The Former Jacksonville CTI Senior Managers and Matthews breached their
fiduciary duty to CTI as described above.

64.    Spade and Ally had knowledge of the Former Jacksonville CTI Senior Manager's
and Matthews' fiduciary duty to CTI. Through his prior employment with CTI, Spade knew of
the senior level management positions held by the Former Jacksonville CTI Senior Managers
and of the Field Manager position held by Matthews, their importance to CTI's operations out of
the Jacksonville branch, and how devastating their mass departure would be to CTI's operations
and customer relations. Spade also knew of the Former Jacksonville CTI Senior Managers' and
Matthews' access to CTI's confidential proprietary information and trade secrets.

65.    Ally, through Spade, provided substantial assistance and encouragement to the
Former Jacksonville CTI Senior Managers' and Matthews' breach of their fiduciary duty to CTI.
Specifically, Spade and Ally provided substantial assistance by participating in a conspiracy with
the Former Jacksonville CTI Senior Managers and Matthews to breach their fiduciary duty, and
by encouraging the misappropriation of CTI's confidential proprietary information and trade

secrets to be used by Ally to unfairly compete with CTI. Ally ratified and approved Spade's conduct as described above.

66.     As a proximate result of Spade and Ally's conduct in aiding and abetting the Former Jacksonville CTI Senior Managers' and Matthews' breach of fiduciary duty, CTI has suffered lost business, lost goodwill, lost reputation, lost corporate opportunities and other damages.

67.     Spade and Ally acted willfully and with malice in aiding and abetting the Former Jacksonville CTI Senior Managers' and Matthews' breach of fiduciary duty, and thus, their conduct warrants the imposition of punitive damages.

## COUNT III – VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT FLA STAT. §§ 688.001 ET SEQ.
### (TRIASSI, JONES AND ALLY)

68.     CTI incorporates by reference the allegations contained in the preceding paragraphs as though fully restated herein.

69.     Triassi and Jones misappropriated trade secrets of CTI, including bid templates, pricing tools, material cost information, presentation information, quantity information and margin information, for the purpose of having Ally use CTI's trade secrets to unfairly compete for CTI business.

70.     Triassi and Jones obtained CTI's trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or to limit their use, pursuant to Fla. Stat. § 688.002, namely, as CTI's employee and senior managers. As CTI's employees, Triassi and Jones were subject to the common law duty of loyalty to CTI, including the duty to protect their employer's trade secrets, and they were further bound by the confidentiality provisions of the Code.

71.     CTI takes precautions and steps to ensure the secrecy of its trade secrets. For example, in or around October, 2013, CTI revised its Code of Business Conduct and Ethics (hereinafter the "Code") and provided copies to its employees, including the Former Jacksonville Senior Managers and Matthews.

72.     The Code contains a section devoted to Confidential Information and Intellectual Property, which provides in pertinent part as follows:

> Associates must maintain the integrity of confidential information and ensure that such information is used solely for its intended purpose. Confidential information typically includes valuable commercial information, owned by [CTI] or entrusted to use by suppliers, customers and others related to our business, which is competitively sensitive and not generally known to the public. It may include certain written or oral information, data or documents relating to a business, including without limitation current or prospective customer or vendor lists, pricing or rates, guidelines, manuals, standard operating procedures, personal notes, worksheets, computer data, source code, presentations, memoranda, operation, sales, promotions and marketing methods, techniques and studies, financial and corporate record, information pertaining to pending or future acquisitions, divestures or similar transaction (including information pertaining to related financings, if any). If any Associate is unsure about whether certain information is confidential, and what restrictions may apply, please contact the Legal Department.

73.     The Code also contains a section devoted to the Protection and Proper Use of Assets, which provides in pertinent part as follows:

> Proper protection and efficient use of Company, supplier, customer and other third party assets, such as electronic communications systems, information (proprietary or otherwise), material, facilities and equipment, as well as intangible assets, is the responsibility of each Associate. Associates must not use such assets for personal profit for themselves or others and must act in a manner to protect such assets from loss, damage, misuse, theft, removal and waste.

74.     During their employment with CTI, Triassi, Jones, Matthews and Vallejos acknowledged receipt and understanding of the Code.

75.     CTI also protects its confidential proprietary information and trade secrets through a multi-layered security and risk management program called Secured Network Intelligence Platform for Enterprise Risk Management ("S.N.I.P.E.R."). The program limits access to only those employees who have a need to use CTI's confidential proprietary information and trade secrets within the scope of their jobs.

76.     Triassi and Jones took the trade secrets without authority and in direct violation of the Code for their own use and for the use and benefit of Ally.

77.     The trade secrets misappropriated by Triassi and Jones derive independent economic value by not being known to the public and by not being readily ascertainable by proper means. The trade secrets allow Ally to validate and refine its methods without having to develop the tools and processes that CTI invested in significantly over many years.

78.     CTI used reasonable efforts to maintain the secrecy of the trade secrets by limiting their access on the CTI computer system to employees with an account and password. CTI further required its employees, including Triassi and Jones, to abide by the confidentiality provisions of the Code.

79.     Ally knows that Triassi and Jones do not have authority from CTI to access and use CTI's trade secrets at Ally, and thus, Ally has misappropriated CTI's trade secrets by using those trade secrets to further its business in direct competition with CTI.

80.     Triassi and Jones and Ally have misappropriated CTI's trade secrets in violation of Fla. Stat. § 688.002 by disclosing or threatening to disclose such trade secrets without CTI's consent and despite Triassi and Jones's duty to maintain the secrecy of such information or limit its use.

18

81. Triassi, Jones and Ally have misappropriated CTI's trade secrets in violation of Fla. Stat. § 688.002 by preparing to use or using trade secrets that they received from Triassi and Jones, who owed a duty to CTI to maintain the secrecy of such information and to limit its use.

82. Pursuant to Fla. Stat. § 688.004, CTI is entitled to actual damages caused by the misappropriation and unjust enrichment damages.

83. Pursuant to Fla. Stat. § 688.004, CTI is entitled to exemplary damages that are double the actual and unjust enrichment damages based on their willful and malicious misappropriation.

84. Pursuant to Fla. Stat. § 688.005, CTI is entitled to an award of its attorneys' fees.

### COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT
#### (ALLY)

85. CTI incorporates by reference the allegations contained in the preceding paragraphs as though fully restated herein.

86. CTI has an enforceable non-solicitation agreement with Triassi that serves to protect its legitimate business and business expectancies with its customers, suppliers and employees.

87. Triassi's non-solicitation agreement prohibits Triassi, for one year after his termination of employment, from soliciting those CTI customers and suppliers with whom he developed and maintained the business relationship for CTI and about whom he obtained confidential information. This agreement also prohibits Triassi, for one year after his termination from employment, from soliciting CTI's employees to leave CTI.

88. Ally had knowledge of Triassi's non-solicitation agreement with CTI.

89. Ally intentionally interfered with CTI's contract with Triassi by improper means, specifically by encouraging and causing Triassi to breach his contractual duties of non-

solicitation of the customers, suppliers and employees of CTI in furtherance of a conspiracy to unfairly and improperly steal CTI's business as described above, including breaches of fiduciary duty and the misappropriation of confidential information and trade secrets.

90.    Defendants, through their unlawful conduct, have tortiously and without privilege interfered with CTI's contracts and business expectancies.

91.    As a proximate result of Defendant's unlawful conduct, CTI has suffered lost goodwill, lost business, lost corporate opportunities and other damages.

92.    CTI suffered and continues to suffer damages as a result of the unlawful conspiracy and tortious interference with CTI's business and vendor relationships, which could exceed $10,000,000.

## COUNT V – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
### (ALLY)

93.    CTI incorporates by reference the allegations contained in the preceding paragraphs as though fully restated herein.

94.    By the conduct described above, Ally intentionally interfered with CTI's contract or business expectancies with its customers through improper means, specifically by encouraging and causing Triassi to breach his contractual duties of non-solicitation of the customers, suppliers and employees of CTI, and by causing the Former Jacksonville Senior Managers and Matthews to breach their fiduciary duty to CTI. Other improper means utilized by Ally include the conspiracy to injure CTI and misappropriation of CTI's confidential proprietary information and trade secrets.

95.    Ally, through its unlawful conduct, have tortiously and without privilege interfered with CTI's contracts and business expectancies.

20

96.     As a proximate result of Ally's unlawful conduct, CTI has suffered lost business, lost goodwill, lost corporate opportunities and other damages.

97.     CTI suffered and continues to suffer damages as a result of the unlawful conspiracy and tortious interference with CTI's business and installer relationships, which could exceed $10,000,000.

## COUNT VI – CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

98.     CTI incorporates by reference the allegations contained in the preceding paragraphs as though fully restated herein.

99.     Defendants combined and agreed mutually to act for the purpose of willfully and maliciously injuring the trade and business of CTI in Jacksonville, Florida, both by planning to misappropriate CTI's trade secrets and confidential proprietary information and to use those trade secrets and confidential proprietary information to unfairly compete for the business that CTI provides to its customers. In addition, Defendants conspired to have the Former Jacksonville CTI Senior Managers and Matthews terminate their employment with CTI, sequentially *en mass,* and without adequate notice, and thereby deprive CTI of critical management and operational functions for its Jacksonville, Florida operations; to have the Former Jacksonville CTI Senior Managers and Matthews solicit each other, as well as other employees to depart CTI at or around the same time, and to work for Ally; and to have the CTI Former Jacksonville CTI Senior Managers and Matthews take CTI's confidential propriety information and trade secrets with them to Ally to use while employed by Ally in order to steal CTI's business for Ally's benefit.

100.     Defendants conspired with each other to solicit CTI's employees, its customers and installers in an attempt to benefit themselves and Ally and in order to injure CTI.

21

101. As a result of the conspiracy, the Former Jacksonville CTI Senior Managers and Matthews individually and collectively breached their fiduciary duty to CTI.

102. As a result of the conspiracy, Defendants individually and collectively tortiously interfered with CTI's business and vendor relationships.

103. CTI has suffered and continues to suffer damage as a result of all of the Defendants' civil conspiracy could exceed $10,000,000.

## COUNT VII - CONVERSION
### (ALL DEFENDANTS)

104. CTI incorporates by reference the allegations contained in the preceding paragraphs as though fully restated herein.

105. Defendants, without authority, have taken possession of CTI's confidential proprietary information and trade secrets.

106. Defendants had no right to acquire this information. They do not own it, and they have no right to keep it. Such taking constitutes a wrongful exercise of control and authority over CTI's confidential proprietary information and trade secrets.

107. This conduct amounts to conversion of CTI's property to which Defendants have no right.

108. As a this wrongful exercise of control and authority over CTI's property, CTI has been damaged in an amount equal to the economic value that Defendants have received by taking, possessing and using CTI's property.

## COUNT VIII – BREACH OF NON-SOLICITATION AGREEMENT
### (TRIASSI)

109. CTI incorporates by reference the allegations contained in the preceding paragraphs as though fully restated herein.

110.    Upon accepting employment with CTI, Triassi signed a non-solicitation agreement with CTI.

111.    Under the non-solicitation agreement, Triassi agreed that for one year following the termination of his employment with CTI, he would not directly or indirectly solicit or attempt to solicit any business from any of CTI's customers or suppliers related to CTI business existing as of the date of [his] termination with whom [he] had material contact and he would not solicit any person or entity who is an employee of CTI to terminate his, her or its relationship with CTI.

112.    In breach of the non-solicitation agreement, Triassi is using the relationships that he developed with CTI customers to solicit business from those CTI customers to benefit himself and Ally.

113.    In addition, Triassi assisted Ally in soliciting Jones, Matthews, Vallejos and other employees to leave CTI to be employed by Ally.  In so doing, Triassi breached the non-solicitation agreement.

114.    Triassi also breached the non-solicitation agreement by soliciting CTI's installers to leave CTI to perform services for Ally.

115.    Triassi's breach of the non-solicitation agreement has caused CTI to suffer damages, including the loss of goodwill and business with CTI's customers, installers and employees.

116.    CTI seeks damages for the loss of goodwill and business arising from Triassi's breach of contract, which damages could exceed $10,000,000.

### COUNT IX – VIOLATION OF COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. §1030(a)(2)(C)) (Against Defendants Jones, Matthews, and Triassi)

117.    CTI incorporates by reference the allegations contained in the preceding paragraphs as though fully restated herein.

23

118.    CTI maintains computers and a computer network in which it develops and stores confidential proprietary information and trade secrets. CTI's computers are "protected computers" under 18 U.S.C. § 1030(e)(2)(B), because they are used in and/or affect interstate and foreign commerce or communication.

119.    Jones, Matthews and Triassi deliberately, purposefully, and intentionally accessed CTI's protected computers, without or in excess of their authorized access, and thereby obtained information from the protected computers.

120.    CTI placed restrictions on access to and use of its assets, including its protected computers, and confidential information. Jones, Matthews, and Triassi violated CTI's restrictions and authority to access CTI's computers when they accessed CTI's computers for the purpose of taking CTI's confidential proprietary information and trade secrets for their own use and Ally's use.

121.    By their actions, Jones, Matthews, and Triassi intentionally accessed a computer without authorization or in excess of authorization and thereby obtained information from a protected computer in violation of 18 U.S.C. § 1030(a)(2)(C).

122.    As a result of the improper conduct of Jones, Matthews, and Triassi in violation of 18 U.S.C. § 1030(a)(2)(C), CTI has incurred in excess of $5,000 of losses in a one year period for investigating the offenses, responding to the offenses, and conducting a damages assessment related to the offenses in violation of 18 U.S.C. § 1030(g) and (c)(4)(A)(i)(I). By way of example and not limitation, CTI has to date incurred $12,908.40 in fees for the forensic investigation of the Defendants' offenses and protected computers.

123.    CTI has also experienced losses in the amount of employee work time and its inability to provide services to its customers due to the misconduct Matthews and Jones deleting

critical CTI data from their CTI laptop computers. To date, CTI has been unable to fully retrieve, restore and/or duplicate some of this lost data.

124.    Pursuant to 18 U.S.C. § 1030(g), CTI is entitled to recover compensatory damages and preliminary and injunctive relief prohibiting Jones, Matthews, and Triassi from further violations of the CFAA, 18.U.S.C. § 1030, and prohibiting Defendants from using the confidential proprietary information and trade secrets Jones, Matthews, and Triassi wrongfully obtained.

### COUNT X - VIOLATION OF FEDERAL COMPUTER AND ABUSE ACT (18 U.S.C. § 1030(a)(4)) (Against Defendant Jones, Matthews, and Triassi)

125.    CTI incorporates by reference the allegations contained in the preceding paragraphs as though fully restated herein.

126.    CTI maintains computers and a computer network in which it develops and stores confidential proprietary information and trade secrets. CTI's computers are "protected computers" under 18 U.S.C. § 1030(e)(2)(B), because they are used in and/or affect interstate and foreign commerce or communication.

127.    Jones, Matthews and Triassi, knowingly and with the intent to defraud CTI, accessed protected computers without or in excess of their authorized access and took and destroyed CTI's confidential proprietary information and trade secrets maintained in CTI's protected computers in order to deceive CTI and for their own gain, for the gain of Ally, and in furtherance of Defendants' plan to steal and decimate CTI's business. By means of such conduct, Jones, Matthews, and Triassi furthered the intended fraud and obtained confidential business information, proprietary information, and/or trade secrets of value.

128.   CTI placed restrictions on access to and use of its assets, including its protected computers, and confidential proprietary information and trade secrets. Jones, Matthews, and Triassi violated CTI's restrictions.

129.   By their actions, Jones, Matthews, and Triassi, knowingly and with intent to defraud accessed protected computers without authorization or in excess of their authorization, and by means of such conduct furthered the intended fraud and obtained confidential proprietary information and/or trade secrets of value in violation of 18 U.S.C. § 1030(a)(4).

130.   As a result of the improper conduct of Jones, Matthews, and Triassi in violation of 18 U.S.C. § 1030(a)(4), CTI has incurred in excess of $5,000 of losses in a one year period for investigating the offenses, responding to the offenses, and conducting a damage assessment related to the offenses in violation of 18 U.S.C. § 1030(g) and (c)(4)(A)(i)(I). By way of example and not limitation, CTI has to date incurred $12,908.40 in fees for the forensic investigation of the Defendants' offenses and protected computers.

131.   CTI has also experienced losses in the amount of employee work time and its inability to provide services to its customers due to the misconduct Matthews and Jones deleting critical CTI data from their CTI laptop computers. To date, CTI has been unable to fully retrieve, restore and/or duplicate some of this lost data.

132.   Pursuant to 18 U.S.C. § 1030(g), CTI is entitled to recover compensatory damages preliminary and injunctive relief prohibiting Jones, Matthews, and Triassi from further violations of the CFAA, 18.U.S.C. § 1030, and prohibiting Defendants from using the confidential proprietary information and trade secrets Jones, Matthews, and Triassi obtained.

### COUNT XI – VIOLATION OF COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. §1030(a)(5)(A)-(C)) (Against Defendants Jones and Matthews)

133.    CTI incorporates by reference the allegations contained in the preceding paragraphs as though fully restated herein.

134.    CTI maintains computers and a computer network in which it develops and stores confidential proprietary information and trade secrets.  CTI's computers are "protected computers" under 18 U.S.C. § 1030(e)(2)(B), because they are used in and/or affect interstate and foreign commerce or communication.

135.    Jones and Matthews knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization to a protected computer in violation of 18 U.S.C. § 1030(a)(5)(A).

136.    Jones and Matthews intentionally accessed protected computers without authorization and, as a result of such conduct, recklessly caused damage in violation of 18 U.S.C. § 1030(a)(5)(B) and caused damage and loss in violation of 18 U.S.C. § 1030(a)(5)(C).

137.    CTI placed restrictions on access to and use of its assets, including its protected computers, and confidential proprietary information and trade secrets and required that its employees protect its assets from loss, damage, misuse, theft, removal and waste.  Jones and Matthews violated CTI's restrictions.

138.    As a result of the improper conduct of Jones and Matthews, CTI has incurred in excess of $5,000 of losses in a one year period for investigating the offenses, responding to the offenses, and conducting a damage assessment related to the offenses in violation of 18 U.S.C. § 1030(g) and (c)(4)(A)(i)(I).  By way of example and not limitation, CTI has to date incurred $12,908.40 in fees for the forensic investigation of the Defendants' offenses and protected computers.

27

139.    As a result of the improper conduct of Jones and Matthews, CTI has also experienced losses in the amount of employee work time and its inability to provide services to its customers due to the misconduct Matthews and Jones deleting critical CTI data from their CTI laptop computers. To date, CTI has been unable to fully retrieve, restore and/or duplicate some of this lost data.

140.    As a result of the improper conduct of Jones and Matthews, CTI has experienced damages in the form of damage to its protected computers and impairment to the integrity and availability of data, program, system, or information contained in its protected computers, including the integrity and availability of CTI's confidential proprietary information and trade secrets. Jones and Matthews deleted a huge amount of data from protected computers without authorization. Some of the data Matthews and Jones deleted from protected computers was permanently deleted, as CTI has been unable to fully retrieve, restore and/or duplicate some of this lost data.

141.    Pursuant to 18 U.S.C. § 1030(g), CTI is entitled to recover compensatory damages and preliminary and injunctive relief prohibiting Jones and Matthews from further violations of the CFAA, 18.U.S.C. § 1030.

**PRAYER FOR RELIEF**

WHEREFORE, CTI requests that it be awarded the following relief:

(a)    An order permanently enjoining Triassi from employment with Ally for one year from the date of this Court's order to give effect to the language (one year non-solicitation) of Triassi's non-solicitation agreement;

(b)    An order permanently enjoining Triassi, Jones, Matthews, Vallejos, Spade and Ally from using CTI's confidential information proprietary information and trade secrets improperly taken from CTI, and enjoining Defendants from directly or indirectly contracting

with, soliciting, or otherwise doing business with CTI's customers using CTI's confidential information, proprietary information, and trade secrets;

(c)   An order permanently enjoining Defendants from directly or indirectly accepting any business from CTI's customers (including, but not limited to, ICI, David Weekley, Maronda Homes, Fox Homes, Standard Pacific and KB Homes), and Ally's customers where such business is obtained using CTI's confidential proprietary information and trade secrets;

(d)   An order permanently enjoining, for one year, Triassi from directly or indirectly soliciting for employment any individual employed by CTI to leave his/her employment to work for, consult with, provide services to, or lend assistance to Ally or any other entity in violation of the his non-solicitation provisions;

(e)   An order permanently enjoining Defendants from directly or indirectly continuing to use or possess any property they stole and converted from CTI, including, but not limited to, CTI's confidential proprietary information and trade secrets, and ordering that all Defendants immediately return any such property, including, but not limited to, CTI's confidential proprietary information and trade secrets;

(f)   An order requiring Defendants to produce for inspection and imaging all computers and other electronic storage devices and e-mail accounts belonging to, under the control of, accessible to, or operated by each of the Defendants or any agent of each of the Defendants since February 1, 2014;

(g)   An order requiring an accounting by each Defendant of all sales made and profits received as a result of their efforts in violation of their legal obligations set forth herein;

(h)   Judgment awarding CTI compensatory damages, including, but not limited to, lost profits, as may be determined to have resulted from the improper actions of Defendants. All

punitive damages as may be determined to have resulted from the improper actions of Defendants;

      (i)     Judgment awarding CTI a reasonable royalty against Defendants for the unauthorized disclosure or use of CTI's trade secrets;

      (j)     Judgment awarding CTI costs and attorneys' fees in an amount to be determined at trial pursuant to Fla. Stat. §688.0005; and

      (k)     Such other relief as the Court deems just and necessary.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all of its claims for relief that are so triable.

Dated: May 7, 2015.                    Respectfully submitted,

                                       PLAINTIFF,
                                       CREATIVE TOUCH INTERIORS, INC.
                                       d/b/a HD SUPPLY INTERIOR SOLUTIONS

                                       LECLAIR RYAN
                                       Attorneys for Plaintiff
                                       Riverfront Plaza, East Tower
                                       951 East Byrd Street
                                       Post Office Box 2499
                                       Richmond, Virginia 23219
                                       Telephone: 804.783.2003
                                       Facsimile: 804.783.2294
                                       E-Mail: steven.brown@leclairryan.com

                                       By: _____
                                            STEVEN D. BROWN
                                            Florida Bar No. 996350

#15950615 v3

31